UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROY J. MEYERL<br><br>    Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC.<br><br>    Defendants. | Civil Action No.:<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This action arises out of Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

## JURISDICTION

2. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4. Plaintiff ROY J. MEYERL (hereinafter "Plaintiff") is a natural person who resides in the City of Sarver, County of Butler, Commonwealth of Pennsylvania, and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

5. Defendant Equifax Information Services, LLC. (hereinafter "Defendant Equifax" or Equifax") is a foreign corporation incorporated under the laws of Georgia, with its headquarters at 1558 Peachtree Street NE, Atlanta, Georgia 30309, and is

authorized to do business in Pennsylvania. Defendant Equifax is a "consumer credit reporting agency," referred to herein as CRA, as defined by 15 U.S.C. § 1681a(f) of the Act, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing "consumer reports," as defined in § 1681a(d) of the Act, to third parties.

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

6. Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (National Consumer Law Center, 2nd ed. 2006).

7. Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

8. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

9. The FCRA was proposed in 1968 as an amendment to the original Truth in

Lending Act. Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 8 (National Consumer Law Center, 5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

10. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 8 (National Consumer Law Center, 5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

11. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 10 (National Consumer Law Center, 5th ed. 2002).

12. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 5 (National Consumer Law Center, 5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

13. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness, but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living

standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

14. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003, but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. (Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf).

15. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

16. Consumer reporting agencies Experian, Trans Union, Innovis and Equifax, the Defendant, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers, such as Carrington to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data

4

furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

17. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the (Consumer Data Industry Association) CDIA's "Credit Reporting Resource Guide."

18. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

19. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification (ACDV) electronic form.

20. The ACDVs have many fields in its body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

21. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

22. ACDV documents are "interim" communications between data furnishers, such as mortgage companies, and Equifax to whom it is directed.

24. However, upon information and belief, data furnishers, also report monthly by an electronic means to each CRA telling the CRA, such as Equifax, the current credit history of the consumer upon whom it is reporting.

25. It appears, upon information and belief that Equifax has communicated with

Plaintiff's mortgage company, Carrington, in an inconsistent and confusing manner since before December of 2014.

26. The results of such inconsistent reporting are set out below.

## FACTUAL ALLEGATIONS

27. Before 2000, Plaintiff purchased a house and mortgaged that the home and that mortgage was eventually serviced through Carrington Mortgage Company ("Carrington"). The mortgage had an identification number of 1508458.

28. Due to some unforeseen hardship, Plaintiff amassed a significant amount of debt and so he filed for Chapter 7 Bankruptcy in October 2005, file number 2:05-BK-38931 in federal court in the Western District of Pennsylvania.

29. In April, 2006, the Bankruptcy Court issued an order discharging Plaintiff's debts listed in the Chapter 7 case. The mortgage loan owed to Carrington was discharged.

30. Thus, this discharged debt to Carrington occurred almost ten (10) years ago.

31. Likewise, any payments, whether timely or late, on such a discharged loan should not be reported per the industry standard promulgated by the CDIA, of which both Carrington and Equifax are members.

### *Plaintiff's Disputes with Defendant EQUIFAX – First Dispute*

32. In 2014, Plaintiff wanted to ensure that his creditors, including Carrington, were aware of or had participated in Plaintiff's Chapter 7 bankruptcy plan and were reporting Plaintiff's accounts completely and accurately as required by the FCRA.

*See* 15 U.S.C. § 1681s-2(a) (requiring that furnishers of information provide accurate information).

33. Plaintiff received his credit report compiled by Defendant Equifax on December 23, 2014, from Equity Lending in Zelienople, Pennsylvania.

34. That report correctly noted that Plaintiff has filed Bankruptcy in October of 2005 and was discharged in April of 2006.

35. Also listed in Plaintiff's above referenced credit report from Defendant Equifax was Plaintiff's mortgage with Carrington which also included the balance of the loan and some late payments in 2014 long after the Bankruptcy discharge and which according to CIDA protocol and Metro II should not be reported in any manner.

36. Plaintiff's mortgage account with Carrington was listed by and published to others by Defendant Equifax with the balance of $85,725 and a status of "open" plus late payments.

37. On December 30, 2014, Plaintiff sent a dispute letter to Defendant Equifax, requesting that they change information in Plaintiff's credit report to reflect that Plaintiff's mortgage with Carrington was not being reported accurately.

38. Upon information and belief, as a part of its method of doing business Equifax was well aware of the status of Plaintiff's Bankruptcy filing and discharge date since 2006.

39. Upon information and belief, Defendant Equifax, per its duties under 15 U.S.C. § 1681i, notified Carrington of the Plaintiff's dispute.

40. Upon information and belief, despite Carrington's notice of the disputed trade line, Carrington in response to Defendant Equifax verified, presumably by ACDV, that the information contained in Plaintiff's Equifax credit report was true in part, corrected in part, and failed to note Plaintiff's dispute.

41. On January 31, 2015, Plaintiff received a reinvestigation report from Defendant Equifax. It "updated to report paid in full". The Equifax report reported that Plaintiff's mortgage with Carrington had been "included in BANKRUPTCY Ch 7", no payments were noted, but it did fail to note that the Plaintiff disputed the trade line.

42. However, upon information and belief, Carrington, in its **monthly** reporting to Equifax continued to report its trade line as being open with a high credit amount, reducing balance, and some late payments. This reporting was inaccurate and does not adhere to the industry standard.

43. In turn, Equifax continued to compile and publish the inaccurate monthly reporting from Carrington.

44. Thus, Defendant Equifax failed to conduct a reasonable investigation into Plaintiff's dispute, failed to comply with 15 USC 1681e(b), violated 15 U.S.C. § 1681c(f), failed to update his account status, and thus violated 15 U.S.C. § 1681i.

44. These violations of the FCRA were willful and entitles Plaintiff to damages pursuant to 15 U.S.C. § 1681n.

45. Defendant Equifax has a duty under 15 U.S.C. § 1681e(b), whenever it prepares a consumer report, to "follow reasonable procedures to assure maximum possible

accuracy of the information concerning the individual about whom the report relates."

46. Upon information and belief, Defendant Equifax published Plaintiff's credit report to others after the date of Bankruptcy discharge but reported as shown on the November, 2014 credit report.

47. Plaintiff received an additional tri-merge credit report from Equity Lending dated 2-1-15 showing his inaccurate credit history with Carrington.

48. Thus, Equifax has "reinserted" the data that was originally objected to shown on the 12-23-14 credit report and the reinvestigation report of 1-31-15 without complying with 15 U.S.C. § 1681i(a)(5)(B).

49. Plaintiff sought credit in March of 2015 from Equity Lending Group of Zelienople, Pennsylvania.

50. Equity Lending Group purchased a merged "infile" credit report dated March 1, 2015, which showed late payments after Plaintiff's bankruptcy discharge, failed to note that the Carrington mortgage was discharged in bankruptcy, declining balance, late payments, and failure to note the tradeline was disputed and Plaintiff was denied credit based upon that inaccurate report and contained the reinserted data.

51. Likewise, Plaintiff received an additional tri-merge credit reports from Equity Lending dated 4-1-15 showing his inaccurate credit history with Carrington as described above.

### *Plaintiff's Disputes with Defendant EQUIFAX – Second Dispute*

52. Plaintiff subsequent to these 3 inaccurate credit reports, disputed per 1681i with Defendant Equifax on or about April 14, 2015.

53. Plaintiff's disputed that his mortgage with Carrington had not changed and still reported open with a high balance and late payments.  Plaintiff's credit report from Defendant Equifax also bore no notation that there had been a dispute about the Carrington trade line.

54. The reinvestigation report dated May 8, 2015, Defendant Equifax reported Plaintiff's account and account history with Carrington properly and consistent with the industry CDIA standard, but failed to note the dispute.

55. Defendant Equifax failed to conduct a reasonable investigation into Plaintiff's dispute, failed to update his account status as disputed, and violated 15 U.S.C. § 1681c(f) & 1681i, and perhaps included reinsertion material without complying with 1681i(a)(5)(B).

56. These violations of the FCRA were willful and entitle Plaintiff to damages pursuant to 15 U.S.C. § 1681n.

57. Defendant Equifax has a duty under 15 U.S.C. § 1681e(b), whenever it prepares a consumer report, to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

58. Upon information and belief, Defendant Equifax published Plaintiff's credit report to others after the notice of the Bankruptcy discharge and Plaintiff's disputes.

59. Because of Defendant Equifax's failure to properly conduct an investigation, Plaintiff was unable to remove damaging and inaccurate information from his credit report.

60. Plaintiff's inability to correct the blatant errors on his Equifax credit report caused him great anxiety, emotional distress, loss of credit opportunities, and feelings that nothing could be done leading to hopelessness and anger.

### *Plaintiff's Disputes with Defendant EQUIFAX – Third Dispute*

61. Plaintiff received his tri-merge credit report dated June 17, 2015 from Experian Privacy Guard.

62. On that report it showed Equifax reporting Plaintiff's mortgage with Carrington was not noted as being "included in Bankruptcy" but showed the account as open late payments in 2014, and declining loan balance which is inconsistent with the CDIA standard.

63. Again in July of 2015, Plaintiff sent a dispute letter to Defendant Equifax, requesting that they change information in Plaintiff's credit report to reflect that Plaintiff's mortgage with Carrington accurately.

64. On July 14, 2015, a reinvestigation report came from Equifax which showed that it has information that will show the credit history with Carrington reporting accurately except for the missing dispute notation.

65. However, an Equifax credit report dated August 25, 2015, again, unbelievably, shows the inaccurate data on Plaintiff's Carrington mortgage as not in Bankruptcy, late payments, reducing balance, not disputed, and open account.

66. Again Equifax has reinserted inaccurate data that was once or more times removed which is a violation of 15 USC1681i(a)(5)(B).

67. Upon information and belief, Defendant Equifax has reported the Plaintiff's credit history to others per 15 U.S.C. § 1681e(b), but that reporting has been inaccurate because of the erroneously reporting misinformation on the credit history regarding Carrington.

### PLAINTIFF'S DAMAGES

68. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

69. As a result of Defendant's violations, Plaintiff has suffered damage in the form of damage to his credit profile, weakening of his credit worthiness, denial of credit and calling his general reputation into question, and depletion of his credit score.

70. Plaintiff has consistently disputed his credit history with Equifax about Carrington but to no avail, which has frustrated and angered Plaintiff.

71. It was important to Plaintiff's psychological well-being and sense of self-worth that Plaintiff's credit history be accurately reported.

72. Plaintiff also suffered emotional distress in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, loss of focus at work and play, and fear as a result of Defendant's conduct.

73. As a result of Defendant's willful and/or negligent conduct, Plaintiff is entitled to actual, statutory, and punitive damages in addition to attorney's fees and costs as allowed by 15 U.S.C. §§ 1681o&n.

**TRIAL BY JURY**

74. Plaintiff is entitled to and hereby demands a trial by jury. U.S. Const. Amend. 7. Fed. R. Civ. P. 38.

**CAUSES OF ACTION**

**COUNT I.**

**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT –**

**15 U.S.C. § 1681,** *et seq***.**

75. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

76. The foregoing acts and omissions of Defendant Equifax constitute numerous and multiple violations of the FCRA.

77. Defendant Equifax prepared, compiled, issued, assembled, and communicated inaccurate, erroneous, and blatantly false and damaging information about Plaintiff to current and potential creditors.

78. Defendant Equifax willfully violated 15 U.S.C. §§ 1681c(f), 1681e(b), 1681i(a)(5)(B) and 1681i by failing to follow reasonable procedures to assure maximum possible accuracy of Plaintiff's consumer credit history and by allowing derogatory and inaccurate account information to be reported once a dispute was registered by Plaintiff and once removed was reinserted.

79. As a result of Defendant Equifax's violations of 15 U.S.C. §§ 1681c(f), 1681e(b), 1681i(a)(5)(B) and 1681i, Plaintiff has suffered out-of-pocket expenses totaling

approximately $3000, diminished credit rating, been denied credit, and emotional distress in an amount to be determined at trial.

80. Defendant Equifax's conduct, actions and inaction were willful, rendering it liable for punitive damages in an amount to be allowed by the Court pursuant to 15 U.S.C. § 1681n.

81. Alternatively, Defendant Equifax's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o of the Act.

82. Plaintiff is entitled to recover costs and attorney's fees from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered against Defendant for:

- Actual damages suffered by Plaintiff as a result of the FCRA violations by defendant in an amount to be determined at trial against Defendant;

- Statutory and punitive damages in an amount to be determined at trial against Defendant pursuant to 15 U.S.C. § 1681n and § 1681o;

- Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n *et seq.*; and,

- Other and further relief as may be just and proper.

Dated this 31st day of August 2015.    Respectfully submitted,


By: s/ James M. Pietz
James Pietz, Esquire
Pa. I.D. #55406
PIETZ LAW OFFICE
Allegheny Building
429 Forbes Avenue, Ste. 1710
Pittsburgh, PA  15219
Email:  jpietz@jpietzlaw.com

Thomas J. Lyons, Esq. (MN 65699)
**LYONS LAW FIRM, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone:  (651) 770-9707
Facsimile:  (651) 770-5830
Email:  tlyons@lyonslawfirm.com
*To be admitted pro hac vice*

**ATTORNEYS FOR PLAINTIFF**